UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x

THE CITY OF NEW YORK and THE PEOPLE OF THE
STATE OF NEW YORK,

|  |  |
|---|---|
|  | Plaintiffs, |

No. 14-cv-8985(ER)(KNF)

-against-

**SECOND AMENDED
COMPLAINT**

FEDEX GROUND PACKAGE SYSTEM, INC.,

Defendant.

-------------------------------------------------------------------- x

Plaintiffs the City of New York (the "City"), by its counsel Zachary W. Carter, Corporation Counsel of the City of New York, and the People of the State of New York (the "State"), by its Attorney General, Eric T. Schneiderman, Attorney General of the State of New York, respectfully allege, with knowledge of their own actions and on information and belief as to the actions of others, as follows:

## NATURE OF THE ACTION

1.      Defendant FedEx Ground Package System, Inc.'s ("FedEx") persistent engagement in illegal cigarette trafficking prompts this second civil action for injunctive relief, appointment of a Special Master, damages, and penalties under the Contraband Cigarette Trafficking Act, 18 U.S.C. § 2341 *et seq.* ("CCTA"), for treble damages and attorney's fees under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"), for an injunction and penalties under N.Y. Executive Law § 63(12) ("N.Y. Exec. L. § 63(12)") and N.Y. Public Health Law § 1399-ll ("N.Y. PHL § 1399-ll"), and for penalties under an Assurance of Compliance with the New York State Attorney General.

2.      FedEx is a package delivery company that in the regular course of its business delivers packages to persons located in New York State and nationwide.

3.      In February 2006, to resolve an investigation by the New York State Attorney General (the "NYAG") into FedEx's illegal residential deliveries of cigarettes, FedEx agreed to cease such deliveries in New York, an agreement subsequently expanded to include residential cigarette deliveries anywhere in the United States. Even while negotiating that agreement with the NYAG, and thereafter in defiance of that agreement, but more to the point, in violation of several federal and state statutes, from at least 2005 to the present, FedEx knowingly delivered or distributed to consumers throughout the country, including New York City and State, tons of contraband cigarettes ordered over the Internet or by mail from various cigarette trafficking enterprises.

## BACKGROUND

4.      Cigarette smoking is the most significant source of preventable death in the United States. Smoking gives rise to billions of dollars in annual health care costs incurred to treat smoking-related illness.

5.      Higher cigarette prices have been incontrovertibly established to compel greater numbers of smokers to quit, reducing the incidence of smoking-related death and disease. "Raising tobacco excise taxes is one of the most effective policies for reducing the use of tobacco." Institute of Medicine, *Ending the Tobacco Problem: A Blueprint for the Nation*, at 182 (2007);[1] Report of the Surgeon General, *How Tobacco Smoke Causes Disease: The Biology and*

---

[1] *Available at* http://books.nap.edu/openbook.php?record_id=11795&page=182 (last visited May 6, 2015).

*Behavioral Basis for Smoking-Attributable Disease*, at 654 (2010)[2] (noting that "increases in the price of cigarettes through excise taxes . . . are an effective policy intervention to prevent smoking initiation among adolescents and young adults, reduce cigarette consumption, and increase the number of smokers who quit").

6.     A ten-percent increase in cigarette price reduces cigarette use among adults by three to five percent. Frank J. Chaloupka & Rosalie Liccardo Pecula, *The Impact of Price on Youth Tobacco Use*, National Cancer Institute Monograph No. 14, at 194 (Nov. 2001).[3] The response of youths to price increases is even greater, with a ten-percent price increase reducing the number of youth smokers by at least an estimated six or seven percent. *See Prevent All Cigarette Trafficking Act of 2007*, and the *Smuggled Tobacco Prevention Act of 2008: Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 110 Cong. 50, 52 (May 1, 2008) (Statement of Matthew L. Myers, President, Campaign for Tobacco-Free Kids).

7.     States and local governments establish their own cigarette taxes, and significant disparities in the amount of tax imposed therefore exist among different taxing jurisdictions. Those disparities in turn give rise to opportunities for arbitrage, fueling an unlawful interstate market in "unstamped" cigarettes – cigarettes "which bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found." *United States v. Hasan*, 846 F. Supp. 2d 541, 543 (E.D. Va. 2012). When purchased in low-tax jurisdictions and sold in high tax jurisdictions, unstamped cigarettes produce enormous, illegal profits for everyone associated with the trade.

---

[2] *Available at* http://www.surgeongeneral.gov/library/tobaccosmoke/report/chapter9.pdf (last visited May 6, 2015).
[3] *Available at* http://cancercontrol.cancer.gov/tcrb/monographs/14/m14_12.pdf (last visitedMay 6, 2015).

8.     Interstate cigarette trafficking undercuts the salutary effect of high cigarette prices. For example, a study by the New York City Department of Health & Mental Health ("DOH") conducted an evaluation of the public health impact on smokers in New York City of cigarettes bootlegged from the Poospatuck Indian Reservation and imported into the City for resale, concluding that if the cigarettes had been fully taxed, in one year 1,370 additional New York City smokers would have quit smoking, avoiding 450 premature deaths. *City of New York v. Golden Feather Smoke Shop, Inc.,* 2009 U.S. Dist. LEXIS 76306, at *67-69 (E.D.N.Y. 2009).

9.     A study of smokers to whom bootlegged cigarettes were easily available, Shelley, D. *et al.*, "The $5 Man: The Underground Economic Response to a Large Cigarette Tax Increase in New York City," *Am J. Public Health*, 97(8) 1483-88 (2007), concluded that although interest in quitting smoking was high, bootleggers created an environment in which reduced-price cigarettes undermined cessation efforts and undermined the public health goals of the tax increase. Data from another study by the City DOH also concluded that "the availability of cheap cigarettes through untaxed sources may have provided a disincentive for tax-avoidant smokers to quit." Coady, M. *et al*., "The Impact of Cigarette Excise Tax Increases on Purchasing Behaviors Among New York City Smokers," *Am J. Public Health*, 103(6) 54-60 (2013).

10.     Accordingly, "limit[ing] smuggling and the availability of untaxed tobacco products is essential to maximizing the effectiveness of higher taxes in reducing tobacco use[.]" *Report of the Surgeon General*, *supra* at 654.

11.     On February 3, 2006, FedEx resolved an investigation by the NYAG into illegal residential cigarette deliveries by entering into an "Assurance of Compliance" ("AOC")[4]. The AOC required FedEx, *inter alia*, to comply with N.Y. PHL § 1399-ll, which prohibits delivery of cigarettes to residences, by ceasing all such deliveries in New York. The AOC also required FedEx to implement internal controls designed to assure that FedEx would not engage in further residential cigarette deliveries, and provided for a penalty of $1,000 per violation.

12.     Even while negotiating the AOC, and afterwards, in utter disregard of that agreement with the NYAG, from at least 2005 to the present, FedEx serviced a number of contraband cigarette trafficking businesses that operated as so-called "delivery-sellers," *i.e.*, cigarette sellers that exploit interstate differences in cigarette tax rates by shipping cigarettes to consumers in states with cigarette taxes higher than the taxes in the delivery-sellers' state. FedEx thus not only delivered cigarettes directly to residences, in violation of PHL 1399-ll, N.Y. Exec. L. § 63(12), and the AOC, but the cigarettes it delivered were "unstamped" cigarettes, *i.e.*, not affixed with the tax stamps of the jurisdictions into which the cigarettes were delivered, thereby evading cigarette taxes in those jurisdictions, in violation of the CCTA.

13.     In addition to its deliveries of contraband cigarettes directly to residences, FedEx made deliveries for numerous entities not licensed by the State of New York to deal in cigarettes, including cigarette manufacturers, distributors, and wholesalers, thereby transporting and distributing contraband cigarettes among such entities and also to retail outlets that sold contraband cigarettes to the public, including to City and State residents.

14.     FedEx's shipments of unstamped cigarettes into and within the City and the State injured the City and the State, *inter alia*, in that the City was deprived of the tax of

---

[4] The AOC is publicly available at http://www.ag.ny.gov/sites/default/files/press-releases/archived/FedEx%20-%20Executed%20AOC.pdf (last visited April 5, 2016).

$1.50 per pack, and the State was deprived of the tax of $1.50, $2.75, or $4.35 per pack that should have been paid on all cigarettes sold to persons in the City and State.

15.     Plaintiffs seek in this action to: i) enjoin further deliveries of cigarettes into the City and State by FedEx; ii) require FedEx to submit to oversight by a court-appointed Special Master empowered to monitor FedEx's tobacco deliveries and assure FedEx's compliance with federal and state law governing tobacco deliveries; iii) recover damages under the CCTA equal to the amount of each $1.50 tax stamp that should have been affixed to each pack of unstamped cigarettes that FedEx shipped, transported, and/or distributed in the City and the amount of each $1.50, $2.75 or $4.35 tax stamp that should have been affixed to each pack of unstamped cigarettes that FedEx shipped, transported, and/or distributed in the State; iv) recover damages under RICO equal to three times the amount of each $1.50 tax stamp that should have been affixed to each pack of unstamped cigarettes shipped, transported, or distributed in the City and three times the amount of each $1.500, $2.75 or $4.35 tax stamp that should have been affixed to each pack of unstamped cigarettes that FedEx shipped, transported, and/or distributed in the State; v) recover civil penalties under the CCTA, N.Y. Exec. L. § 63(12), and N.Y. PHL § 1399-ll; vi) recover penalties of $1000 per violation of the AOC; and vii) recover the attorney's fees and costs incurred in bringing this action.

16.     A related action brought by the present plaintiffs, *City of New York and People of the State of New York v. FedEx Ground Package System, Inc*., 13-cv-9173-ER-KNF (S.D.N.Y.), seeks to recover damages and civil penalties for illegal cigarette deliveries made by FedEx for cigarette delivery-sellers Shinnecock Smoke Shop (Shinnecock"), Cigarettes Direct To You ("CD2U"), FOW Enterprises, Inc. ("FOW"), and Native Made Tobacco ("Native Made"). This complaint expressly excludes claims arising out of deliveries for those entities.

## PARTIES

17.     Plaintiff the City of New York (the "City") is a municipal corporation organized under the laws of the State of New York.

18.     Plaintiff the People of the State of New York (the "State") is represented by its attorney, Eric T. Schneiderman, Attorney General of the State of New York.

19.     Defendant FedEx Ground Package System, Inc. ("FedEx") is a corporation organized under the laws of the State of Delaware, with a principal place of business at 1000 FedEx Drive, Moon Township, Pennsylvania 15108.

## JURISDICTION AND VENUE

20.     The Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. § 1964(c), 18 U.S.C. § 2346(b), and 28 U.S.C. §§ 1331, 1332, and 1367.

21.     Venue is proper under 28 U.S.C. § 1391(b), because a substantial part of the events and omissions giving rise to the claims occurred in this district.

## FACTS

### Cigarette Taxation and Regulation in New York

22.     The State and City of New York each impose a separate excise tax on cigarettes. With exceptions not relevant to this complaint, the tax applies to all cigarettes possessed for sale or use in the State or the City, as the case may be, pursuant to New York State Tax Law ("N.Y. Tax .L.") §§ 471, 471-a and Administrative Code of the City of New York ("Ad. Code") § 11-1302(a)(1). The "use" of cigarettes in the State or City is "any exercise of a right or power, actual or constructive, including but not limited to receipt, storage or any keeping or retention for any length of time." N.Y. Tax L. § 471-a; Ad. Code § 11-1301(4). All cigarettes sold, possessed for sale or used in New York State and City are presumed subject to the cigarette tax, and hence must bear a tax stamp, until the contrary is established, with the burden of proof

of non-taxability on the person asserting an exemption from taxation. *See* N.Y. Tax L. § 471; Ad. Code § 11-302(d).

23.     State and City cigarette excise taxes are pre-paid by "cigarette stamping agents," who are usually wholesale cigarette dealers licensed by the State and City of New York to purchase and affix tax stamps. New York State mandates that stamping agents serve as the only entry point for cigarettes into New York's stream of commerce.

24.     To indicate that the tax has been pre-paid on cigarettes to which the tax applies, stamping agents must affix a cigarette tax stamp to every package of cigarettes possessed by the agent for sale in the State and/or City, as the case may be. N.Y. Tax L. § 471; 20 N.Y.C.R.R. § 76.1(a)(1); Ad. Code § 11-302(e). All cigarettes possessed for sale or use in New York State and City, with exceptions not relevant to this complaint, must bear tax stamps. N.Y. Tax L. § 471; 20 N.Y.C.R.R. § 76.1(a)(1); Ad. Code § 11-302(g).

25.     To comply with the foregoing requirements, stamping agents purchase tax stamps from the State and City, the cost of which is nearly equal in cost to the amount of the cigarette tax on a pack of cigarettes. By purchasing the tax stamps, the tax is paid. By law, stamping agents must incorporate the amount of the tax into the price of the cigarettes, thereby passing the tax burden to each subsequent purchaser in the distribution chain, and ultimately the consumer, as required by N.Y. Tax L. § 471 and Ad. Code § 11-302(e) and (h).

26.     One carton of cigarettes contains ten (10) packs of twenty (20) cigarettes each. At all times relevant to this complaint, the New York City excise tax has been $1.50 per pack or $15.00 per carton. On June 3, 2008 the New York State excise tax was increased to $2.75 per pack or $27.50 per carton from $1.50 per pack or $15.00 per carton.  Since July 1, 2010, the New York State excise tax has been $4.35 per pack or $43.50 per carton.  Every pack

of cigarettes in New York State is required to have affixed to it a New York State excise tax stamp, evidencing revenue to the State of $1.50, $2.75, or $4.35. Every pack of cigarettes in New York City is required to have affixed to it a joint New York State/New York City tax stamp, the City's share of which is $1.50 in revenue.

### FedEx's Assurance of Compliance with the NYAG

27.     In 2004, the NYAG investigated FedEx for delivering cigarettes to consumers in violation of N.Y. PHL § 1399-ll, which prohibits the delivery of all cigarettes to residences, whether tax stamped or not.

28.     Section 1399-ll(1) provides that, in New York State, cigarettes may be shipped only to (a) state-licensed cigarette tax agents, state-licensed wholesale dealers, or registered retail dealers, (b) export warehouse proprietors or customs bonded warehouse operators, or (c) agents of the federal or state government. Section 1399-ll(2) provides, in turn:

> It shall be unlawful for any common or contract carrier to knowingly transport cigarettes to any person in this state reasonably believed by such carrier to be other than a person described in [1399-ll(1)]. For purposes of the preceding sentence, if cigarettes are transported to a home or residence, it shall be presumed that the common or contract carrier knew that such person was not a person described in [1399-ll(1)]….

29.     In February 2006, FedEx entered into the AOC with the NYAG, in which it agreed, *inter alia*, to "at all times comply with Pub. Health L. 1399-ll," to terminate relationships with shippers that unlawfully attempted to use FedEx to ship cigarettes to unauthorized recipients, and to report those shippers to the NYAG. FedEx also agreed to monitor and investigate its own shipments to assure compliance with the AOC.

30.     The AOC also required FedEx to maintain, adhere to, and publicize to its customers a policy prohibiting the shipment and delivery of cigarettes to unauthorized recipients. FedEx was required to revise any and all of its internal policies to ensure that they were

consistent with the terms of the AOC, and to communicate those policies to all employees and contractors.

31.     FedEx agreed that it would pay the NYAG $1,000 for every violation of the AOC.

**FedEx's Cigarette Shipments for Delivery-Sellers**

32.     From at least 2005 to the present, including during the period in which FedEx was negotiating the AOC, FedEx has knowingly shipped tens of thousands of cartons of cigarettes, including unstamped cigarettes, to individual residences in New York City, New York State, and indeed nationwide.

33.     By way of example, between at least 2005 and 2010, FedEx knowingly shipped tens of thousands of cartons of unstamped cigarettes to residences in the City and State on behalf of Your Kentucky Tobacco Resource LLC and Cigarettes For Less, cigarette delivery-sellers both based in Russell, Kentucky.

34.     By way of further example, between at least 2006 and 2012, FedEx knowingly shipped tens of thousands of cartons of unstamped cigarettes to residences in the City and State on behalf of Shinnecock Indian Outpost, a cigarette delivery-seller based in Southampton, New York.

35.     FedEx knew the packages it delivered for cigarette delivery-sellers contained unstamped cigarettes because FedEx sales representatives maintain close relationships with FedEx clients, speaking with clients about their business, visiting clients' business locations and learning about their clients' businesses with the goal of offering clients business advice intended to increase the number of client shipments.

36.     FedEx employees, including those who negotiated and entered into written agreements with cigarette delivery-sellers on behalf of FedEx, or managed the cigarette delivery-

sellers' accounts for FedEx, or maintained the cigarette delivery-sellers' business relationships with FedEx, knew that the delivery-sellers were in the business of selling and shipping untaxed cigarettes to residential customers.

37.     In addition, some of the delivery-sellers for whom FedEx made cigarette deliveries use the term "cigarette" or "tobacco" or "smoke" in the names under which they did business, thereby alerting FedEx to the nature of the products they shipped – for example, "Your Kentucky Tobacco Resource" and "Cigarettes For Less."

38.     FedEx employees routinely visit the businesses of FedEx's cigarette delivery-seller clients to make package pick-ups, and accordingly directly observe that these clients were shipping cigarettes, including unstamped cigarettes.

39.     FedEx knew that the deliveries it made for cigarette delivery-sellers were to residences, for consumers, because FedEx categorized the deliveries as "residential" and imposed a residential delivery surcharge on the cigarette delivery-sellers.

40.     FedEx employees communicated on a regular basis with its cigarette delivery-seller clients in writing, by telephone, and in person regarding, among other things, business trends, volume, and needs.

41.     FedEx employees visited the premises of its cigarette delivery-seller clients and observed their advertisement, promotion, and sale of untaxed cigarettes.

42.     FedEx employees visited the premises of its cigarette delivery-seller clients and observed packages containing cartons of cigarettes to be delivered by FedEx to residential customers.

43.     FedEx employees communicated with employees of its cigarette delivery-seller clients on a regular basis regarding lost, stolen, or delayed FedEx shipments of cigarettes to individual customers at residential addresses.

44.     FedEx categorized the businesses of some of its delivery-seller clients as "tobacco stores or stands."

45.     FedEx employees also knew from internal "improper shipping" notifications generated by FedEx regarding shipments by its cigarette delivery-seller clients that those clients were shipping cigarettes to individual customers at residential addresses.

46.     Some of the Internet websites of FedEx's delivery-seller clients informed customers that their cigarette orders would be shipped by FedEx.

47.     FedEx employees knew that the purpose of businesses that offer to sell and ship cigarettes via Internet, phone, and mail order is to deliver unstamped cigarettes to individual consumers in order to evade payment of required taxes.

48.     FedEx employees knew, or should have known, that shipments of cigarettes to residences were prohibited by N.Y. PHL § 1399-ll and FedEx's AOC, and knew that the reason for this prohibition was, *inter alia*, that the purpose of such shipments is to deliver unstamped cigarettes to individual consumers in order to evade payment of required taxes and to allow youthful smokers to evade age-restrictions on the purchase of cigarettes.

49.     FedEx departed from its usual business practices to participate in and facilitate the cigarette dealers' unlawful sales of cigarettes, including unstamped cigarettes, to residential customers. For example, FedEx has a system of notifications that are generated when FedEx employees discover that a customer is shipping or attempting to ship prohibited materials through FedEx. In the ordinary course of business, FedEx would issue a warning to the offending

shipper regarding the prohibited shipment and ultimately, if prohibited shipments continued, terminate its business relationship with the shipper. Despite the fact that its cigarette delivery-seller clients illegally shipped tens of thousands of cartons of unstamped cigarettes to residential customers through FedEx, FedEx continued its relationships with the cigarette dealers for many years.

50.     Indeed, under the AOC, FedEx agreed to terminate relationships with shippers that unlawfully used FedEx to ship cigarettes to unauthorized recipients, and to report such shippers to the NYAG. Despite the fact that many of FedEx's delivery-seller clients illegally shipped tens of thousands of cartons of unstamped cigarettes through FedEx, FedEx continued its relationships with these cigarette dealers for many years, and never reported the shipments to the NYAG.

### FedEx's Cigarette Shipments for Unlicensed Entities

51.     Until at least 2015, FedEx knowingly distributed into New York City and State thousands of cartons of contraband cigarettes that FedEx transported and distributed among various cigarette manufacturers, wholesalers, and/or distributors not licensed by the State of New York to deal in cigarettes or tobacco products.

52.     For example, until at least 2015, FedEx transported and distributed thousands of cartons of unstamped cigarettes that FedEx knew were unstamped for Smokin' Joe's of Sanborn, New York, J. Conrad Seneca of Irving, New York, and Ohserase of Hogansburg, New York. FedEx transported and distributed these unstamped cigarettes to various cigarette distributors and sellers that distributed the cigarettes in the City and State but which were not licensed by the State to do so.

53.     FedEx knew the packages it delivered for manufacturers and unlicensed distributors contained unstamped cigarettes because FedEx sales representatives maintain close

relationships with FedEx clients, speaking with clients about their business, visiting clients' business locations and learning about their clients' businesses with the goal of offering clients business advice intended to increase the number of client shipments.

54. FedEx employees, including those who negotiated and entered into written agreements with manufacturers and/or unlicensed distributors on behalf of FedEx, or managed these manufacturers and distributors' accounts for FedEx, or maintained these manufacturers and distributors' business relationships with FedEx, knew that the manufacturers and/or unlicensed distributors were in the business of selling and shipping untaxed cigarettes.

55. In addition, some of these entities for whom FedEx made cigarette deliveries use the terms "tobacco," "smoke," "cigar," or variants thereof, in the names under which they did business, thereby alerting FedEx to the nature of the products they shipped.

56. FedEx employees routinely visit the businesses of FedEx's cigarette manufacturer and/or unlicensed distributor clients to make package pick-ups, and accordingly directly observe that these clients were shipping cigarettes, including unstamped cigarettes.

57. FedEx employees communicated on a regular basis with its cigarette manufacturer and unlicensed distributor clients in writing, by telephone, and in person regarding, among other things, business trends, volume, and needs.

58. FedEx employees visited the premises of its cigarette manufacturer and unlicensed distributor clients and observed their advertisement, promotion, and sale of untaxed cigarettes.

59. FedEx employees visited the premises of its cigarette manufacturer and unlicensed distributor clients and observed packages containing cartons of unstamped cigarettes to be delivered by FedEx.

60.     FedEx employees communicated with employees of its cigarette manufacturer and unlicensed distributor clients on a regular basis regarding lost, stolen, or delayed FedEx shipments of cigarettes.

61.     FedEx employees also knew from internal "improper shipping" notifications generated by FedEx regarding shipments by its cigarette manufacturer and unlicensed distributor clients that those clients were shipping unstamped cigarettes.

62.     FedEx employees knew that the purpose of businesses that offer to sell and ship unstamped cigarettes is to evade payment of required taxes.

* * *

63.     From at least 2005 to the present, FedEx knowingly delivered in or into New York City and State tens of thousands of cartons of cigarettes, some of which lacked New York City or New York State tax stamps and were hence contraband, for the following cigarette trafficking enterprises:

- Your Kentucky Tobacco Resource LLC, Russell, KY;

- Cigarettes For Less, Russell, KY;

- Shinnecock Indian Outpost, Southampton, NY;

- Hidden Spirits Smoke Shop, Southampton, NY;

- Shinnecock Indian Nation / Shinnecock Nation Authority, Southampton, NY;

- AJ'S Cigar, Irving, NY;

- Two Pine Enterprises, Basom, NY;

- Anthony Bergstrom, Salamanca, NY;

- Discount Tobacco Outlet, Myrtle Beach, SC;

- Kee Missouri DC, Neosho, MO;

- Smokin' Joe's, Sanborn, NY;

- Lakeside Enterprises, Seneca Falls, NY;

- J. Conrad Seneca, Irving, NY;

- B&B Express Wholesale, Southampton, NY;

- Flatwater Trading Co., Winnebago, NE;

- Lake Erie Tobacco Co., Kill Buck, NY;

- Native Pride/Six Nation, Irving, NY;

- Ohserase, Hogansburg, NY;

- Ramona Bennett, Gowanda, NY;

- Rock River Imports, Winnebago, NE; and

- Tarbell Management Group, Hogansburg, NY.

### Allegations Related to the CCTA

64.     The CCTA, 18 U.S.C. § 2341 *et seq*., provides that it is unlawful knowingly to ship, transport, receive, possess, sell, distribute, or purchase "contraband cigarettes," defined as more than 10,000 cigarettes (50 cartons) found in a jurisdiction without the cigarette tax stamps required by law in that jurisdiction affixed to them ("unstamped cigarettes"). 18 U.S.C. § 2341(2); 18 U.S.C. § 2342(a).

65.     Pursuant to a narrow exemption in the CCTA, intended to permit the transport of unstamped cigarettes from place of manufacture to the approximately 48 separate state cigarette-stamping programs, the only unstamped cigarettes that are not contraband cigarettes are unstamped cigarettes in the possession of cigarette manufacturers, common carriers or entities licensed to affix cigarette stamps. 18 U.S.C. § 2341(2) (collectively, "regulated entities").

66.     The effect of statutory language that defines unstamped cigarettes as non-contraband only when "in the possession" of a regulated entity is that any regulated entity engaging in transactions with an entity other than another regulated entity will have engaged in conduct with contraband cigarettes: because the cigarettes do not remain in the possession of the regulated entity at all times, they will have been shipped, transported, received, possessed, sold, distributed, or purchased from or to a non-exempt entity, in the hands of which the cigarettes are contraband. By operating within a distribution chain consisting of non-exempt entities, a regulated entity thereby engages in conduct with contraband cigarettes, whether "distribution," "shipping" or "receipt." For example, a common carrier with no liability for possessing unstamped cigarettes that transfers possession of unstamped cigarettes to a consumer is liable under the CCTA: the cigarettes are contraband in the hands of the consumer, and the common carrier has placed them there, and thus has "distributed" contraband cigarettes. *See City of New York v. Gordon,* 2013 U.S. Dist. LEXIS 71953, at *23-27 (S.D.N.Y. May 21, 2013).

67.     Consistent with this view, 49 U.S.C. § 80302(a)(5), which lists articles defined as "contraband" that may not be legally transported by common carrier, includes "a cigarette <u>involved in</u> a [CCTA] violation," (emphasis added), thereby classifying as contraband those cigarettes received from or transferred to persons not permitted to possess unstamped cigarettes, *i.e.*, cigarettes "involved in" a CCTA violation.

68.     As discussed above, FedEx knew that the cigarettes it shipped for the cigarette dealers were unstamped because FedEx employees (a) understood that the cigarette dealers were in the business of selling and shipping untaxed cigarettes to residential customers or unlicensed businesses who sold to residential customers; (b) communicated with owners and employees of the cigarette dealers regarding their businesses; (c) visited the cigarette dealers'

premises and observed their advertisement, promotion, and sale of untaxed cigarettes; (d) observed the cigarette dealers' packages containing cartons of unstamped cigarettes for delivery by FedEx to residential customers or unlicensed businesses; (e) communicated with the cigarette dealers' employees regarding lost, stolen, or delayed FedEx shipments of cigarettes to residential customers or unlicensed businesses; (f) knew that its delivery-seller clients advertised and offered the sale of untaxed cigarettes to residential customers via the Internet, phone, and/or mail order; (g) knew that the purpose of businesses that offer to sell and ship cigarettes via Internet, phone, and mail order is to unlawfully deliver unstamped cigarettes to individual consumers in order to evade payment of required taxes; and (h) knew that the reason for the prohibition on delivery of cigarettes to residences was, *inter alia*, to prevent the delivery of unstamped cigarettes to consumers and unlicensed businesses and to prevent the evasion of age restrictions on cigarette purchases.

69.     FedEx further knew that the cigarettes it shipped for certain of its tobacco clients were unstamped because those clients were located on Indian reservations or had Indian-themed business names, and there is widespread public knowledge that Indian reservation tobacco businesses deal in unstamped cigarettes.

70.     FedEx also knew, as a result of its lengthy negotiations with the NYAG in connection with the AOC, that the purpose of mail order cigarette businesses is to deliver unstamped cigarettes to consumers to evade payment of required taxes, and generally understood the business model of mail order cigarette dealers.

71.     FedEx also knew that mail order cigarette dealers sold unstamped cigarettes through its participation in the several years of lobbying by the package-delivery

industry that accompanied the enactment of both N.Y. PHL § 1399-ll and the federal Prevent All Cigarette Trafficking ("PACT") Act.

72.     By receiving, shipping, transporting, and/or distributing cigarettes in New York City and State on which New York State and City tax stamps had not been affixed, FedEx violated the CCTA.

### Allegations Related to RICO

73.     The RICO statute, 18 U.S.C. § 1962(c) and (d), provides a civil cause of action to persons injured in their business or property by reason of the defendant's operation of, or conspiracy to operate, an enterprise through a pattern of racketeering acts.

74.     CCTA violations are "racketeering acts" under the RICO statute. The thousands of deliveries of unstamped cigarettes made by FedEx over several years, amounting to multiple CCTA violations, constitute a pattern of racketeering activity. FedEx thereby conducted the affairs of enterprises affecting interstate commerce through a pattern of racketeering activity, or agreed that the affairs of the enterprises would be conducted in that manner, and thereby violated and/or conspired to violate RICO.

### The Enterprises

75.     At all times relevant to this complaint, each cigarette dealer for which FedEx shipped cigarettes constituted an enterprise within the meaning of 18 U.S.C. § 1961(4) in that each dealer was a corporation, a limited liability company, or a sole proprietorship with several employees and/or associates.

76.     In the alternative, each cigarette dealer or its owners and/or employees, and FedEx, constituted an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4).

77.    Each enterprise for which FedEx shipped cigarettes operated in the Southern District of New York and elsewhere, and was engaged in, and its activities affected, interstate and foreign commerce. Each enterprise for which FedEx shipped cigarettes constituted an ongoing organization whose members and associates functioned as a continuing unit for many years, with the common purpose of receiving income from the sale, shipment, distribution and delivery of contraband cigarettes.

78.    The purpose of each enterprise was to generate money for each associate of the enterprise through the sale of unstamped cigarettes. This purpose was implemented by the enterprise associates through various legal and illegal activities, but principally through the shipment, transport, receipt, possession, sale, distribution, and/or purchase of unstamped cigarettes in interstate commerce.

79.    Each associate of each enterprise had relationships with the other associates of the enterprise, in that each associate was involved in the shipment, transport, receipt, possession, sale, distribution, and/or purchase of unstamped cigarettes for the benefit of the enterprise.

80.    Each enterprise and its activities continued for at least two years and/or could have continued to engage in sales of unstamped cigarettes indefinitely if its activities had not been terminated by law enforcement.

81.    At all times relevant to this complaint, FedEx has been associated with each enterprise for which FedEx shipped cigarettes, providing the enterprises with delivery services, package tracking services, customer relations services, software and hardware services, business advice and generally facilitating the enterprises' deliveries of contraband cigarettes.

82.   At all times relevant to this complaint, the affairs of each enterprise for which FedEx shipped cigarettes have been conducted through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1)(B), consisting principally of thousands of instances of contraband cigarette trafficking, in violation of 18 U.S.C. § 2341 *et seq.*

### Role of the Enterprise Associates: FedEx

83.   At all times relevant to this complaint, FedEx participated in the management and operation of each enterprise for which FedEx shipped cigarettes by controlling the pick-up and delivery of unstamped cigarettes from the enterprises and delivering those cigarettes nationwide, and specifically by (a) receiving unstamped cigarettes from the enterprises for distribution to residences or unlicensed businesses who distributed to residences; (b) subject to FedEx's own methods and means, and at FedEx's discretion, using information provided to FedEx by the enterprises to transport and distribute the cigarettes to their customers; (c) allowing the enterprises access to FedEx's package tracking system; (d) allowing the enterprises' customers access to FedEx's package tracking system; and (e) providing general logistics, marketing, and delivery support services to the enterprises designed to increase each enterprise's shipments. FedEx participated in the conduct of the affairs of each enterprise for which FedEx shipped cigarettes by shipping, transporting, receiving, and/or distributing of cigarettes that did not bear tax stamps. In this manner FedEx performed a critical function for each enterprise, which otherwise would have been unable to service the lucrative market of customers ordering unstamped cigarettes through mail order, telephone, and Internet.

84.   From at least 2005 to the present, within the Southern District of New York and elsewhere, FedEx knowingly and intentionally shipped, transported, and/or distributed cigarettes lacking valid New York City and State tax stamps to City and State residents in violation of 18 U.S.C. § 2342(a).

85.     At all times relevant to this complaint, FedEx participated in the management or operation of the affairs of each enterprise for which FedEx shipped cigarettes directly or indirectly through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B), 1961(5) and 1962(c), in violation of 18 U.S.C. § 1962(c), by committing multiple and continuing acts of contraband cigarette trafficking in violation of 18 U.S.C. § 2341 *et seq*., through, *inter alia*, the shipment, transport, and/or distribution of unstamped cigarettes to City and State residents.

86.     At all times relevant to this complaint, FedEx also conspired with associates of each enterprise for which FedEx shipped cigarettes to violate the provisions of 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d), by agreeing to further endeavors of the Enterprises that, when completed, amounted to contraband cigarette trafficking, in violation of the CCTA, 18 U.S.C. § 2341 *et seq*., and by agreeing that the affairs of each enterprise would be conducted through a pattern of racketeering activity.

87.     At all times relevant to this complaint, FedEx agreed to a plan with associates of each enterprise for which FedEx shipped cigarettes whereby the enterprises would receive, possess, sell, ship, and/or distribute contraband cigarettes to City and State residents and elsewhere and FedEx would ship, transport, and/or distribute those unstamped cigarettes to the enterprise customers in New York City, New York State, and elsewhere, in violation of the CCTA.

88.     FedEx recognized that an essential element of this plan consisted of multiple violations of 18 U.S.C. § 2341 *et seq*. FedEx agreed that certain conspirators, including itself and other associates of each enterprise would commit CCTA violations, while other

associates of the Enterprises, including FedEx, would engage in conduct intended to support and facilitate the violations of the CCTA.

89.     Between at least 2005 and 2015, both dates being approximate and inclusive, within the Southern District of New York and elsewhere, FedEx, together with others, being persons employed by or associated with each enterprise for which FedEx shipped cigarettes, enterprises that engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally conspired to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of each enterprise for which FedEx shipped cigarettes through a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1), (5). FedEx agreed that one or more associates of each enterprise for which FedEx shipped cigarettes would commit thousands of racketeering acts in conducting the affairs of the Enterprises.

90.     FedEx departed from its usual business practices in participating in and facilitating the unlawful sales by each enterprise for which FedEx shipped cigarettes. For example, FedEx has a procedure for identifying, rejecting, and returning attempted shipments of any prohibited materials such as tobacco. In the ordinary course of business, FedEx would issue a warning to the offending customer regarding the prohibited shipment and ultimately, if prohibited shipments continued, terminate its business relationship with the customer. FedEx also publicly states that its policy is to decline to ship cigarettes to consumers. Although FedEx recognized that each enterprise for which FedEx shipped cigarettes was selling and shipping unstamped cigarettes to individual consumers at residential addresses, FedEx decided, contrary to its usual practice, to continue to provide delivery services to those enterprises.

91.     All of FedEx's departures from its normal business practices are evidence that FedEx intended to, and did in fact, actively facilitate the contraband cigarette trafficking of the enterprises for which FedEx shipped cigarettes.

**Allegations Related to N.Y. Exec. L. § 63(12) and N.Y. PHL § 1399-ll**

92.     Pursuant to N.Y. Exec. L. § 63(12), the Attorney General is authorized to seek injunctive relief, restitution, damages and costs against any person or business entity that has engaged in repeated fraudulent or illegal acts or otherwise engaged in persistent fraud or illegality in the conduct of business.

93.     Violation of any state law or regulation constitutes "illegality" within the meaning of N.Y. Exec. L. § 63(12) and is actionable thereunder.

94.     FedEx's repeated and persistent violations of N.Y. PHL § 1399-ll are actionable under N.Y. Exec. L. § 63(12).

95.     N.Y. PHL § 1399-ll(1) provides that, in New York State, cigarettes may be shipped only to (a) licensed cigarette tax agents, licensed wholesale dealers, or registered retail dealers, (b) export warehouse proprietors or customs bonded warehouse operators, or (c) agents of the federal or state government. Section 1399-ll(2) provides, in turn:

> It shall be unlawful for any common or contract carrier to knowingly transport cigarettes to any person in this state reasonably believed by such carrier to be other than a person described in [1399-ll(1)]. For purposes of the preceding sentence, if cigarettes are transported to a home or residence, it shall be presumed that the common or contract carrier knew that such person was not a person described in [1399-ll(1)]. . . .

96.     It was self-evident, both from the recipients' addresses on the shipping labels as well as from actual observation of the delivery locations by FedEx employees, that the locations to which FedEx delivered thousands of packages containing unstamped cigarettes on behalf of various cigarette dealers were not authorized recipients under 1399-ll(1).

97.    FedEx also knew for the reasons described above (in paragraphs 32-62) that it was transporting cigarettes to unauthorized recipients.

98.    Indeed, FedEx categorized its deliveries for its cigarette delivery-seller clients as "residential" and included a residential delivery surcharge in its pricing, demonstrating that FedEx knew it was transporting cigarettes to "home[s] or residence[s]."

99.    By knowingly transporting cigarettes to persons in New York City and State other than those designated as permissible recipients of cigarette deliveries, FedEx repeatedly violated N.Y. PHL § 1399-ll.

100.   Such violations constitute repeated and persistent illegality in violation of N.Y. Exec. L. § 63(12).

101.   The PACT Act prohibits a state from enforcing "against a common carrier a law prohibiting the delivery of cigarettes or other tobacco products to individual consumers or personal residences without proof that the common carrier is not exempt" pursuant to a "settlement agreement," defined to include "the Assurance of Compliance entered into by the Attorney General of New York and Federal Express Corporation and FedEx Ground Package Systems, Inc. on or about February 3, 2006, if [that] agreement[] is honored throughout the United States to block illegal deliveries of cigarettes or smokeless tobacco to consumers." 15 U.S.C. § 376a(e)(3), (5).

102.   This Court has held that "if the AOC qualifies as a 'settlement agreement' under the PACT Act, FedEx is exempted and no NYPHL claim can be brought against it," and that the PACT Act language "'honored throughout the United States' means 'recognized' by the various states." *City of New York v. FedEx Ground Package Sys.*, 14-cv-8985 (ER), 2016 U.S. Dist. LEXIS 44616, at *16-18 (S.D.N.Y. Mar. 31, 2016).

103.    On information and belief, the AOC is not recognized by the various states "to block illegal deliveries of cigarettes or smokeless tobacco to consumers."  This is because the AOC (i) does not provide any other state with a right to enforce the AOC, and (ii) does not provide any other state with a right to obtain any penalty for an illegal cigarette delivery into that state.  As provided by the AOC—

> a.    "This Assurance of Compliance shall not grant any rights or privileges to any person or entity who is not a party to this agreement, nor shall this Assurance of Compliance affect or limit in any way the rights of any such third party."

> b.    "FedEx shall pay to the State of New York a stipulated penalty of $1,000 for each and every violation of this Assurance of Compliance occurring after the Effective Date, provided, however, that no penalty shall be imposed if: (a) the violation involves the delivery of Cigarettes to an Individual Consumer outside the State of New York . . . ."

104.    Therefore, on information and belief, most states would use the PACT Act, together with their own state laws, as an enforcement mechanism against FedEx for illegal cigarette deliveries to their consumers because the PACT Act provides a state with a cause of action for civil penalties and other equitable relief, whereas the AOC does not provide the various states with any enforcement capabilities or relief.

105.    On information and belief, the AOC is also not recognized by states in the nation that have a "delivery ban" statute, *i.e.*, a state law prohibiting the delivery of cigarettes or other tobacco products to individual consumers or personal residences.  *See, e.g.*, A.R.S. § 36–798.06 (Arizona, 2012); Conn. Gen. Stat. § 12–285c (Connecticut, 2003); Ind. Code § 24–3–5–

4.5 (Indiana, 2003); 22 M.R.S. § 1555–F (Maine, 2009); Ohio Rev. Code 2927.023 (Ohio, 2005); S.D. Codified Laws § 10–50–99 (South Dakota, 2009); 7 V.S.A. § 1010 (Vermont, 2007); Rev. Code Wash. § 70.155.140 (Washington, 2009).

106.    This is because a state considering whether to recognize the AOC to block illegal deliveries of cigarettes to consumers would, under the terms of 15 U.S.C. § 376a(e)(5)(C), surrender that state's ability to enforce its own delivery ban statute, much less obtain any available damages, costs, penalties, or other relief available under such statute.  As a result, many delivery ban states would be unlikely to "recognize" the AOC.

107.    Accordingly, the AOC is not recognized by all states in the nation, and the PACT Act does not preempt Plaintiffs' N.Y. PHL § 1399-*ll* claims against FedEx.

108.    Additionally, it is self-evident from the facts alleged in this Second Amended Complaint that FedEx does not "honor" its agreement throughout the United States to block illegal deliveries of cigarettes to consumers.  That is, FedEx does not comply with the terms of the AOC because FedEx delivers cigarettes to consumers and entities unlicensed to deal in cigarettes, all in violation of the AOC.  Therefore the PACT Act does not preempt Plaintiffs' N.Y. PHL § 1399-*ll* claims against FedEx.

**<u>Allegations Related to Violations of the Assurance of Compliance</u>**

109.    On February 3, 2006, to resolve an investigation by the NYAG into its illegal shipments of cigarettes, FedEx entered into an AOC.

110.    The AOC required FedEx, *inter alia*, to comply with N.Y. PHL § 1399-ll, which prohibits delivery of cigarettes to unauthorized recipients, by ceasing all such deliveries. The AOC also required FedEx to implement internal controls designed to assure that FedEx would not engage in cigarette deliveries to unauthorized recipients in the future.

111.    The AOC provided for a penalty of $1,000 for each violation by FedEx.

112.    Even as they negotiated the AOC, and continuing on until at least 2015, FedEx delivered cigarettes to unauthorized recipients, in violation of PHL 1399-ll, N.Y. Exec. L. § 63(12), and the AOC.

## FIRST CLAIM FOR RELIEF

### Violation of 18 U.S.C. § 2341 *et seq.*

113.    Plaintiffs reallege paragraphs 1-112 above as if fully set forth herein.

114.    At all times relevant to this complaint, by delivering unstamped cigarettes for delivery-sellers or unlicensed entities, FedEx received, shipped and/or distributed more than 10,000 cigarettes that were found in New York City and New York State not bearing the New York State and City cigarette tax stamps required by N.Y. Tax L. § 471 and Ad. Code § 11-302(e), all in violation of 18 U.S.C. § 2342(a).

115.    As a direct result of the foregoing violations of the CCTA, plaintiffs suffered damages in an amount to be determined at trial, because a $15 New York City tax and $15.00, $27.50, or $43.50 State tax should have been paid on every carton of cigarettes that FedEx received, shipped, and/or distributed in the City and State.

## SECOND CLAIM FOR RELIEF

### Violation of 18 U.S.C. § 1962(c)

116.    Plaintiffs reallege paragraphs 1-115 above as if fully set forth herein.

117.    New York City and New York State are each a "person" as defined in 18 U.S.C. §§ 1961(3) and 1962(c).

118.    Defendant FedEx is a "person" as defined in 18 U.S.C. §§ 1961(3) and 1962(c).

119.    Each delivery-seller or unlicensed entity for which FedEx delivered cigarettes is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c); these enterprises engage in and their activities have an effect on interstate commerce.

120.    In the alternative, each delivery-seller or unlicensed entity or its owners and/or employees, and FedEx, constituted an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c); these enterprises engage in and their activities have an effect on interstate commerce.

121.    FedEx was associated with each enterprise for which FedEx shipped cigarettes and participated directly or indirectly in the conduct of the affairs of those enterprises through a pattern of racketeering activity, in the form of multiple, related acts of contraband cigarette trafficking, in violation of 18 U.S.C. § 2341 *et seq.*

122.    The predicate acts of contraband cigarette trafficking constitute a pattern of unlawful activity within the meaning of 18 U.S.C. § 1961(1)(B). Each enterprise for which FedEx shipped cigarettes engaged in thousands of instances of contraband cigarette trafficking. The acts are connected to one another as part of a scheme to accomplish a uniform purpose, *i.e.*, profiting from the sale and delivery of unstamped cigarettes into New York City, New York State, and elsewhere. The repeated nature of the conduct during the period of the scheme makes the acts continuous.

123.    The City and the State of New York have suffered injury to their business or property within the meaning of 18 U.S.C. § 1964(c) by reason of defendant's violation of 18 U.S.C. § 1962(c), in an amount to be determined at trial, but no less than the total value of all the $1.50 City tax stamps and $1.50, $2.75, or $4.35 State tax stamps that were required to have

been affixed to every pack of cigarettes that FedEx shipped, transported, and/or distributed in or into New York City and New York State.

## THIRD CLAIM FOR RELIEF

### Violation of 18 U.S.C. § 1962(d)

124.    Plaintiffs reallege paragraphs 1-123 above as if fully set forth herein.

125.    New York City and New York State are each a "person" as defined in 18 U.S.C. §§ 1961(3).

126.    Defendant FedEx is a "person" as defined in 18 U.S.C. §§ 1961(3) and 1962(c).

127.    Each delivery-seller or unlicensed entity for which FedEx delivered cigarettes is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c); these enterprises engage in and their activities have an effect on interstate commerce.

128.    In the alternative, each delivery-seller or unlicensed entity or its owners and/or employees, and FedEx, constituted an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c); these enterprises engage in and their activities have an effect on interstate commerce.

129.    FedEx was associated with each enterprise for which FedEx shipped cigarettes, and agreed that the affairs of the enterprises would be conducted through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B) and 1961(5) and 1962(c), to wit, multiple and repeated acts of contraband cigarette trafficking, in violation of 18 U.S.C. § 2341 *et seq.*

130.    FedEx conspired with associates of each enterprise for which FedEx shipped cigarettes within the meaning of 18 U.S.C. § 1962(d), to violate 18 U.S.C. § 1962(c), in that FedEx agreed with other associates of those enterprises that the affairs of the enterprises

would be conducted through a pattern of racketeering activity and that FedEx would further or facilitate endeavors of the enterprises that, when completed, would satisfy all of the elements of a criminal offense, to wit, contraband cigarette trafficking in violation of the CCTA, 18 U.S.C. § 2341 *et seq*.

131. With knowledge that each enterprise for which FedEx shipped cigarettes engaged in multiple and repeated acts of contraband cigarette trafficking in violation of the CCTA, 18 U.S.C. § 2341 *et seq.*, FedEx agreed with associates of the Enterprises to facilitate the activities of the enterprises by providing delivery and package tracking services, assisting the enterprises' customers in the receipt of their packages, and providing other essential services leading to the success of a scheme to traffic contraband cigarettes into New York City, New York State, and elsewhere.

132. The scheme to traffic contraband cigarettes into New York City, New York State, and elsewhere constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1)(B). The predicate acts are both related and continuous. The acts are connected to one another as part of a scheme to accomplish a uniform purpose, which is profiting from the sale of unstamped cigarettes in New York City, New York State, and elsewhere. The repeated nature of the conduct during the period of the scheme makes the acts continuous.

133. The City and State of New York have suffered injury to their business or property within the meaning of 18 U.S.C. § 1964(c) by reason of defendant's violation of 18 U.S.C. § 1962(d), in an amount to be determined at trial, but no less than the total value of all the $1.50 New York City tax stamps and $1.50, $2.75, or $4.35 New York State tax stamps that were required to have been affixed to every pack of cigarettes that FedEx shipped, transported, and/or distributed in or into New York City or State.

## FOURTH CLAIM FOR RELIEF

### Violation of N.Y. Exec. L. § 63(12) and N.Y. PHL § 1399-ll

134.    Plaintiffs reallege paragraphs 1-133 above as if fully set forth herein.

135.    The AOC is not recognized throughout the United States to block illegal deliveries of cigarettes or smokeless tobacco to consumers.

136.    N.Y. PHL § 1399-ll provides that it "shall be unlawful for any common or contract carrier to knowingly transport cigarettes to any person in this state reasonably believed by such carrier to be [an unauthorized recipient]," with the presumption that the deliveries are known to be to unauthorized recipients when made to a home or residence.

137.    A person who violates the provisions of §1399-ll "shall be subject to a civil penalty not to exceed the greater of (a) five thousand dollars for each such violation or (b) one hundred dollars for each pack of cigarettes shipped, caused to be shipped or transported in violation of such subdivision."

138.    Between at least 2005 and the present, FedEx made thousands of deliveries of cigarettes to unauthorized recipients, including homes or residences, in New York City and State, in violation of N.Y. PHL § 1399-ll.  By shipping and transporting cigarettes to persons within New York State, FedEx has repeatedly and persistently violated N.Y. PHL § 1399-ll, and thus has engaged in repeated and persistent illegality in violation of Executive Law § 63(12).

## FIFTH CLAIM FOR RELIEF

### Violation of the AOC

139.    Plaintiffs reallege paragraphs 1-138 above as if fully set forth herein.

140.   On February 3, 2006, FedEx entered into an AOC, which required FedEx, *inter alia*, to comply with N.Y. PHL § 1399-ll, which prohibits delivery of cigarettes to unauthorized recipients, by ceasing all such deliveries.

141.   Per the AOC, FedEx agreed to pay the State a stipulated penalty of $1,000 for each and every later violation of the AOC, provided, however, that no penalty would be imposed if i) the violation involved a shipment of cigarettes to an unauthorized recipient outside the State of New York, or ii) the violation involved the shipment of cigarettes to an unauthorized recipient within the State of New York, but FedEx establishes to the reasonable satisfaction of the Attorney General that FedEx did not know and had no reason to know that the shipment was a prohibited shipment.

142.   Since 2006, FedEx nonetheless proceeded to make thousands of deliveries of cigarettes to unauthorized recipients in New York, in violation of the AOC.

143.   FedEx has furthermore failed to establish to the Attorney General's reasonable satisfaction that FedEx did not know, and had no reason to know, that these shipments were prohibited.

## SIXTH CLAIM FOR RELIEF

### Injunctive Relief and Appointment of a Monitor

144.   Plaintiffs reallege paragraphs 1-143 above as if fully set forth herein.

145.   Plaintiffs are likely to succeed on the merits of their claim that FedEx is in violation of the CCTA, N.Y. Exec. L. § 63(12), and N.Y. PHL § 1399-ll.

146.   Plaintiffs have no adequate remedy at law, in that FedEx has shown itself unable or unwilling to comply voluntarily with the AOC entered into with the NYAG, and has been unable or unwilling to cease conduct that injures the health and safety of a considerable number of persons, and accordingly cannot be remedied by the payment of money damages.

147.    The Court should accordingly i) enjoin FedEx pursuant to 18 U.S.C. § 2346(b)(1) from knowingly shipping, transporting, receiving, possessing, or distributing contraband cigarettes as that term is defined in the CCTA; ii)  enjoin FedEx pursuant to N.Y. Exec. L § 63(12) and N.Y. PHL § 1399-ll from delivering any cigarettes to any home or residence within the State of New York; and iii) appoint a Special Master to assure FedEx's compliance with each of the above statutes, and with the AOC entered into by FedEx with the NYAG.

**WHEREFORE**, Plaintiffs respectfully pray that the Court grant judgment against defendant as follows:

a.    On the First Claim For Relief, award the City damages in an amount equal to the cost of a City tax stamp multiplied by the number of packs of cigarettes that FedEx shipped, transported, and/or distributed in or into New York City, and award the State damages in an amount equal to the cost of a State tax stamp multiplied by the number of packs of cigarettes that FedEx shipped, transported, and/or distributed in or into New York State, in violation of 18 U.S.C. § 2341 *et seq*.;

b.    On the First Claim For Relief, award the City and the State a suitable civil penalty against FedEx, as provided for in 18 U.S.C. § 2341 *et seq*., as measured by the penalty amount specified in 15 U.S.C. § 377(b)(1)(b);

c.    On the Second and Third Claims For Relief, award the City and the State treble damages, measured by the cost of a City tax stamp multiplied by the number of packs of cigarettes that FedEx shipped, transported, and/or distributed in or into New York City, and the cost of a State tax stamp

multiplied by the number of packs of cigarettes that FedEx shipped, transported, and/or distributed in or into New York State, in violation of 18 U.S.C. § 1962(c) and (d);

d.      On the Fourth Claim for Relief, award the State a civil penalty under N.Y. Exec. L. § 63(12) and N.Y. PHL § 1399-ll in the amount of $5,000 for each of FedEx's deliveries of cigarettes made in the State in violation of N.Y. PHL § 1399-ll;

e.      On the Fourth Claim for Relief, to the extent that the City is legally authorized to pursue such penalties, award the City a civil penalty under N.Y. PHL § 1399-ll in the amount of $5,000 for each of FedEx's deliveries of cigarettes made in the City in violation of N.Y. PHL § 1399-ll.

f.      On the Fifth Claim for Relief, award stipulated penalties to the State in the amount of $1,000 for each of FedEx's deliveries of cigarettes made in violation of the AOC;

g.      On the Sixth Claim for Relief, issue an injunction pursuant to 18 U.S.C. § 2346(b)(1), N.Y. Exec. L. § 63(12), and N.Y. PHL § 1399-ll, enjoining and restraining FedEx from shipping any unstamped cigarettes, and/or from shipping any cigarettes to any unauthorized recipients in the State of New York;

h.      On the Sixth Claim for Relief, appoint a Special Master as an independent monitor to oversee and ensure FedEx's compliance with the injunctive relief awarded;

      i.       Award the City and State their attorney's fees, pursuant to 18 U.S.C. § 1964(c); and

      j.       Award such other and further relief as the Court may deem appropriate.


Dated: New York, New York
       April 14, 2016

ZACHARY W. CARTER
Corporation Counsel of the
  City of New York


By:    ___/s/ Krista Friedrich_____
       Eric Proshansky
       Krista Friedrich
         Assistant Corporation Counsel
       100 Church Street, Room 20-99
       New York, New York 10007
       (212) 356-2032
       eproshan@law.nyc.gov
       kfriedri@law.nyc.gov

       *Attorneys for Plaintiff City of New York*


ERIC T. SCHNEIDERMAN
Attorney General of the State of New York


By:    ___/s/ Dana Biberman_____
       Dana Biberman
         Chief, Tobacco Compliance
       Sandra Pullman
         Assistant Attorney General
       Joshua Sprague
         Assistant Attorney General
       120 Broadway
       New York, New York 10271
       (212) 416-6699
       dana.biberman@ag.ny.gov

sandra.pullman@ag.ny.gov
joshua.sprague@ag.ny.gov

*Attorneys for Plaintiff State of New York*